AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| Devices Described in Attachment A. | ) |
| | )     Case No.  2:23-MJ-04677 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

21 U.S.C. § § 841(a)(1), (b)(1)(B)(viii)        Distribution of Methamphetamine

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

 

_____
*Applicant's signature*

Valarie Atwood, ATF Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sarah E. Spielberger, (213) 894-3358

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following digital devices (the "**SUBJECT DEVICES**"), that were seized on June 14, 2023, and which is currently maintained in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives in Riverside, CA:

a.    SUBJECT DEVICE 1: a white Apple iPhone with three cameras in a clear case with a black border;

b.    SUBJECT DEVICE 2: a Black Apple iPhone with no case and 2 cameras;

c.    SUBJECT DEVICE 3: a black Samsung cellphone with three cameras and no case, IMEI: 351223622263013; and

d.    SUBJECT DEVICE 4: a white iPhone with one camera and a clear case with a red border and a ripped blue sticker (collectively, the "SUBJECT DEVICES").

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii) (Distribution of Methamphetamine) (the "SUBJECT OFFENSE"), namely:

a.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers,

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls,

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from the **SUBJECT DEVICES** and which relate to the SUBJECT OFFENSE,

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from the **SUBJECT DEVICES** and which relate to the SUBJECT OFFENSE,

        e.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed,

        f.   Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the SUBJECT OFFENSE,

        g.   Contents of any calendar or date book from January 20, 2022, until June 14, 2023,

        h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations from January 20, 2022, until June 14, 2023, and

        i.   With respect to any **SUBJECT DEVICES** containing evidence falling within the scope of the foregoing categories of items to be seized:

           i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat and instant messaging logs, photographs, and correspondence,

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

        iii. evidence of the attachment of other devices,

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

        v.   evidence of the times the device was used,

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device,

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it,

        viii.   records of or information about Internet Protocol addresses used by the device,

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.    In searching a **SUBJECT DEVICES** (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any **SUBJECT DEVICE** capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each **SUBJECT DEVICE** where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the **SUBJECT DEVICES** as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each **SUBJECT DEVICE** capable of containing any of the items to be seized to the search protocols to determine

whether the **SUBJECT DEVICE** and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f.  If the search determines that a **SUBJECT DEVICE** does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the **SUBJECT DEVICE** and delete or destroy all forensic copies thereof.

        g.  If the search determines that a **SUBJECT DEVICE** does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

        h.  If the search determines that the **SUBJECT DEVICE** is (1) itself an item to be seized and/or (2) contains data

falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a **SUBJECT DEVICE** if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the **SUBJECT DEVICE**, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Valerie H. Atwood, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for warrants to search:

a.   SUBJECT DEVICE 1: a white Apple iPhone with three cameras in a clear case with a black border;

b.   SUBJECT DEVICE 2: a black Apple iPhone with no case and two cameras;

c.   SUBJECT DEVICE 3: a black Samsung cellphone with three cameras and no case, IMEI: 351223622263013; and

d.   SUBJECT DEVICE 4: a white iPhone with one camera and a clear case with a red border and a ripped blue sticker (collectively, the "SUBJECT DEVICES").

2.   These SUBJECT DEVICES are in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in Riverside, California, and are described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii) (Distribution of Methamphetamine) (the "Subject Offense") being committed by Oscar Montejano RODRIGUEZ ("RORDRIGUEZ"), Andrew Joseph BROWN ("BROWN"), and Andrew FLORES ("FLORES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon
my personal observations, training and experience, review of
official reports and undercover agents' videos, and information
obtained from various law enforcement personnel and witnesses.
This affidavit is intended to show merely that there is
sufficient probable cause for the requested search warrants, and
it does not purport to set forth all of my knowledge of or
investigation into this matter. Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. **SUMMARY OF PROBABLE CAUSE**

5.     In early 2022, during three different controlled
purchases, BROWN sold a Confidential Informant ("CI") and/or ATF
undercover agents ("UCs") the following items: (1) 106.9 grams
of fentanyl and a sample of cocaine; (2) two pounds of
methamphetamine; and (3) one pound of methamphetamine and a
privately manufactured assault rifle.

6.     On May 31, 2023, a grand jury indicted BROWN in case
number 23-CR-106-ODW for this conduct.[1]

7.     After law enforcement obtained an arrest warrant for
BROWN, in early June 2023, BROWN arranged to sell an AR-15 style
rifle, two thousand fentanyl pills, and approximately three
pounds of methamphetamine to the UCs for $6,600.

---

[1] This matter is assigned to the Honorable Otis D. Wright II, who
confirmed that a magistrate judge should review this
application. .

2

8.    On June 14, 2023, BROWN and the UCs met at a prearranged location, and BROWN gave the UCs the AR-15 style rifle and fentanyl pills.

9.    Shortly thereafter, a person who law enforcement later identified as RODRIGUEZ arrived at the sale in a GMC Sports Utility Vehicle. A person who law enforcement later identified as FLORES arrived soon after in a silver Volkswagen sedan. RODRIGUEZ then grabbed three clear Ziploc bags containing three pounds of methamphetamine from the Volkswagen and gave them to the UCs and BROWN.

10.   BROWN told RODRIGUEZ he would "get [RODRIGUEZ] later." Based on my training, experience, and conversations with the UCs, I understood that this meant that BROWN would pay RODRIGUEZ later for the methamphetamine.

11.   RODRIGUEZ left in the GMC, and the Volkswagen followed. A few moments later, law enforcement officers found RODRIGUEZ sitting in the driver's seat of the Volkswagen in a nearby parking lot. The GMC was nearby.

12.   After waiving his Miranda rights, RODRIGUEZ claimed ownership of the Volkswagen and the GMC and consented to law enforcement searching both cars.

13.   I searched the Volkswagen and found the SUBJECT DEVICES and $12,960.00 in cash.

14.   Based on my observations, training and experience, conversations with law enforcement, review of video and audio recordings of the drug sale, statements from RODRIGUEZ, and my own knowledge of the investigation, I submit there is probable

3

cause to believe that the SUBJECT DEVICES will have evidence of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii) (Distribution of Methamphetamine) (the "SUBJECT OFFENSE".)

### III. **AFFIANT'S BACKGROUND**

15.  I have been working as a Special Agent ("SA") with the ATF since January 2017. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training Program. As a SA, I am trained in federal firearms and narcotics laws and regulations. I regularly refer to these laws and regulations during the course of my duties.

16.  I have experience investigating violations of federal firearms and narcotics laws and regulations. These include undercover investigations involving firearms, firearms trafficking, and narcotics trafficking.

17.  I am also familiar with how digital devices are used to facilitate and conceal firearms and drug trafficking. Additionally, I am experienced in conducting surveillance, interviewing witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

18.  Prior to working for the ATF, I received a Bachelor of Arts degree in Philosophy from the University of Rochester, a Master of Arts degree in Middle Eastern Studies from the University of Texas at Austin, and a Master of Arts degree in International Security from the Josef Korbel School of

4

International Studies at the University of Denver. I am currently assigned to the ATF Riverside, California Field Office.

### IV. STATEMENT OF PROBABLE CAUSE

**A. BROWN and RODRIGUEZ Sell ATF UCs Three Pounds of Methamphetamine**

19. Based on conversations with law enforcement, review of video and audio of the drug sale, statements from RODRIGUEZ, and my own knowledge of the investigation, I am aware of the following:

20. On May 31, 2023, in case number 23-CR-106-ODW, a grand jury indicted BROWN, under seal, with violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(vi), (b)(1)(C): Distribution of Fentanyl, Cocaine, and Methamphetamine. In summary, this indictment alleges that on January 20, 2022, BROWN distributed 106.9 grams of fentanyl and a sample of cocaine; on February 9, 2022, defendant distributed 884 grams of methamphetamine; and on February 25, 2022, defendant distributed 426 grams of methamphetamine. The Court has since unsealed the indictment.

21. Also on May 31, 2023, the Honorable Sashi H. Kewalramani signed and authorized, under seal, an arrest warrant for BROWN. Judge Kewalramani also authorized search warrants for BROWN's vehicle and residence in case numbers 23-MJ-283 and 23-MJ-284.

22.  In early June 2023, ATF undercover agents ("UC-1") and ("UC-2", collectively, the "UCs"), acting in an undercover capacity, arranged to purchase methamphetamine, fentanyl pills, and an AR-15 type rifle from BROWN for $6,600. The parties agreed to conduct the sale on June 14, 2023, outside an EOS Fitness gym located at 77900 Country Club Drive in Palm Desert, California (the "target location").

23.  On June 14, 2023, at approximately 3:00 p.m., officers equipped UC-1 with audio/video recording devices and an audio transmitting device. Surveillance units consisting of myself, ATF Special Agents, ATF Task Force Officers ("TFO"), and Riverside County Gang Impact Team ("GIT") officers set up surveillance near the target location.

24.  At approximately 4:30 p.m., the UCs arrived at the target location. BROWN arrived about a half hour later and parked his car next to the UCs' vehicle. A GMC SUV arrived soon after BROWN and parked behind the UCs' vehicle.

25.  BROWN then got out of his car and entered the UCs' vehicle carrying a laundry basket. UC-1 asked BROWN if everything was in the basket. UC-1 informed me that he/she was referring to the methamphetamine, fentanyl pills, and firearm that BROWN had previously agreed to sell.

26.  BROWN replied, "hold on," nodded his head in the direction of the GMC, and commented, "that's what ole boy's right here for." BROWN said that two people had come with him to the target location, one of whom was the "big homie." BROWN told the UCs that the laundry basket had the AR-15 type rifle, pills,

6

and ammunition, but that the three pounds of methamphetamine was "behind us."

27.   Around this time, I saw a silver Volkswagen, California license plate number 7XMN747, drive past me. Surveillance saw the Volkswagen stop perpendicularly in between the GMC and the UCs' vehicle.

28.   Next, a Hispanic male, later identified as RODRIGUEZ, exited the GMC, grabbed a package wrapped in a t-shirt from the passenger side of the Volkswagen, and walked to the UCs' vehicle.

29.   RODRIGUEZ removed the t-shirt and placed the package on the front passenger seat of the UCs' vehicle, revealing three clear Ziploc bags of nearly three pounds of methamphetamine.[2] BROWN told RODRIGUEZ,  "I got you later." Based on my review of UC-1's video footage of the sale and my training and experience, I believe that BROWN was telling RODRIGUEZ that he would pay RODRIGUEZ later for the methamphetamine.

30.   Shortly after, RODRIGUEZ drove away in the GMC, the silver Volkswagen drove off with the GMC.[3] GIT officers maintained surveillance of the vehicles and watched the cars park next to each other in a nearby parking lot.

---

[2]  The suspected methamphetamine was processed per ATF policies and procedures and was sent to Drug Enforcement Administration Southwest Laboratory for testing. Lab results showed an approximate net weight of 1,348 grams and the presence of methamphetamine with a purity of approximately 99%.
[3] After RODRIGUEZ and the Volkswagen left, the UCs and BROWN confirmed the price of the methamphetamine, fentanyl, AR-15 type rifle, and ammunition. I, along with other ATF agents, then arrested BROWN pursuant to the warrant.

31.  GIT officers detained the Volkswagen and the GMC in that parking lot. The officers found RODRIGUEZ sitting in the driver's seat of the silver Volkswagen and a Hispanic male, later identified as Andrew FLORES, sitting in the front passenger seat. I arrived on scene soon after.

**B.   RODRIGUEZ allows ATF to search the Volkswagen and ATF find the SUBJECT DEVICES and $12,900 in cash.**

32.  I watched TFO Nicholas Kean advice RODRIGUEZ of his Miranda rights. RODRIGUEZ waived his rights and agreed to speak with law enforcement. He denied giving BROWN and UC-1 methamphetamine and knowing BROWN altogether. RODRIGUEZ also stated that he was the driver and registered owner of the Volkswagen and the GMC.[4]

33.  TFO Kean asked RODRIGUEZ if there was anything illegal in his vehicle. RODRIGUEZ responded that there was not, but that there was about $8,000 in cash that he was paid for writing a song. TFO Kean then asked RODRIGUEZ, "do you mind if we check?" RODRIGUEZ said, "do your thing," which TFO Kean understood as consent.

34.  I searched the Volkswagen and found the SUBJECT DEVICES. I found SUBJECT DEVICE #1 and #2 in center console, SUBJECT DEVICE #3 on the driver's side floorboard, and SUBJECT DEVICE #4 on the front passenger's side floorboard. I also found $12,960 in in cash in the center console.

---

[4] Using law enforcement resources, I have since learned that the Volkswagen is registered to a woman living in Cathedral City, California.

8

35.  I took the SUBJECT DEVICES and cash into custody and booked them as evidence at the ATF Riverside Field Office. Riverside County Sheriff's Department arrested RODRIGUEZ for possession of narcotics.

36.  Later, I showed the UCs a California Department of Motor Vehicles Driver's License Photograph of RODRIGUEZ. They confirmed that RODRIGUEZ was the person who gave them the methamphetamine. I reviewed footage from the UCs' vehicle and saw that RODRIGUEZ was clearly depicted on audio and video handing three Ziplock bags of methamphetamine to BROWN and the UCs.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES AND THE USE OF DIGITAL DEVICES TO FURTHER THEM

37.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences or vehicles.

      c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

      e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

      f.   Drug traffickers often maintain large amounts of United States currency to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. They often store such currency in their residences and vehicles.

      g.   .

      h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

12

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

42.  Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities of the

SUBJECT OFFENCE in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
Valerie H. Atwood, Special
Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed to and sworn before me
this _____ day of _____, 2023.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

14